967 F.2d 591
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Anna SPARHAWK, Plaintiff-Appellant,
v.
Louis W. SULLIVAN, Secretary of Health & Human Services,
Defendant-Appellee.
 No. 90-35585.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Nov. 7, 1991.
Decided July 2, 1992.
 
 Before TANG, O'SCANNLAIN and RYMER, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 In November 1986, Anna Sparhawk applied for social security disability benefits on the basis of a congenital spinal defect exacerbated by a work injury. After a hearing, the administrative law judge ("ALJ") found her eligible for benefits during the period November 20, 1984, to December 31, 1987. The ALJ concluded that Ms. Sparhawk's disability, and thus eligibility for benefits, terminated as of January 1, 1988. The Social Security Administration's Appeals Council affirmed the ALJ's decision. Sparhawk appealed to federal district court. In May 1990, the district court affirmed the agency's decision. Sparhawk appeals. We vacate and remand with directions.
 
 BACKGROUND
 
 3
 Anna Sparhawk is currently 54 years old. She is 5 feet, 5 1/2 inches tall and her weight hovers around 200 pounds. Sparhawk first started suffering back and leg pain in 1983 while working in a laundry. In December 1983, Dr. Norwyn Newby examined Sparhawk. After x-rays, Dr. Newby diagnosed "Grade 2 spondylolisthesis with spondylolysis of L4 on L5 with narrowing at that interspace." While Dr. Newby felt this was a congenital impairment, he believed that Sparhawk's work at Mission Laundry, which entailed frequent lifting, twisting, and bending, exacerbated the condition.
 
 
 4
 In April 1987, following two failed operations to fuse her lower vertebrae, Sparhawk underwent a third surgery that involved disc removal, re-fusion, and Steffe plate installation.
 
 
 5
 By mid-1987, doctors were declaring Sparhawk's fusion to be solid. X-rays taken in September 1987 revealed the L4-L5 fusion to be intact. However, these same x-rays also revealed "minimal motion" between the L5-S1 vertebrae. In December 1987, Sparhawk complained to Dr. Misko of aching in her neck, shoulders, and wrists, and of urinary incontinence.
 
 
 6
 In January 1988, Dr. Glenn Snodgrass briefly examined Sparhawk for purposes of closing her workers compensation claim. Dr. Snodgrass categorized Sparhawk's spondylolysis and spondylolisthesis as "mildly moderate." He noted that Sparhawk was "developing a solid fusion at the L4-L5 level." Nevertheless, Dr. Snodgrass observed, the spondylolisthesis "was not completely reduced." Dr. Snodgrass concurred with Dr. Misko that Sparhawk was medically stationary. He did not attribute Sparhawk's neck pains to her back problem. He admitted that he did not evaluate Sparhawk's knees, despite her complaint of aching knee joints.
 
 
 7
 On February 5, 1988, Dr. Newby wrote the workers compensation insurance carrier and stated: "I disagree with regard to [Sparhawk's] permanent partial disability in that it should be in the moderate category rather then the mild to moderate category." Dr. Newby agreed, though, that Sparhawk was medically stationary.
 
 
 8
 In March 1988, Sparhawk's examining physicians diagnosed her with chronic back pain, possible hypesthesia of the lower extremity, muscle contraction headaches, and depression. She received treatment for these conditions at least through May 1988.
 
 DISCUSSION
 
 9
 Under the Social Security Act, Sparhawk's benefits may be terminated only upon a showing of substantial evidence that
 
 
 10
 (A) there has been any medical improvement in the individual's impairment or combination of impairments (other than medical improvement which is not related to the individual's ability to work), and
 
 
 11
 (B) the individual is now able to engage in substantial gainful activity.
 
 
 12
 42 U.S.C. § 423(f)(1). "Medical improvement" occurs when there "is any decrease in the medical severity of [the claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant was] disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1). Sparhawk's medical improvement is thus to be assessed by comparing the current severity of her impairment with its severity at the time of the last medical assessment finding disability (i.e., prior to her successful fusion surgery). Id. § 404.1594(b)(7).
 
 
 13
 Additionally, before Sparhawk's benefits can be terminated, any improvement in her medical condition must be accompanied by an increase in her "functional capacity to do basic work activities." Id. § 404.1594(b)(2). The "residual functional capacity" gauges a claimant's ability to work in spite of an impairment. Id. § 404.1594(b)(4). Medical improvement will be deemed related to work capacity if current residual functional capacity exceeds prior residual functional capacity as of the last medical decision diagnosing disability. Id. § 404.1594(c)(2). The increase in functional capacity must be traceable to changes in the signs, symptoms, or laboratory findings accompanying Sparhawk's impairment. See id.
 
 
 14
 The ALJ predicated its termination of Sparhawk's benefits on two factors. First, the ALJ observed that surgery had apparently succeeded in solidly fusing the L4 and L5 vertebrae. This medical improvement, according to the ALJ, sufficiently alleviated Sparhawk's impairment to permit her to return to light-level work. Second, the ALJ did not find Sparhawk's testimony concerning the disabling level of her pain to be credible for the period after December 1987. We hold that both aspects of the ALJ's decision lack a sufficient evidentiary basis.
 
 
 15
 A. Medical Improvement and Residual Functional Capacity
 
 
 16
 According to the regulations, Sparhawk's medical improvement must be manifested in terms of improved signs, symptoms, or laboratory reports before the improvement will strip Sparhawk of her disability status. 20 C.F.R. § 404.1594(b)(1). The ALJ's reliance on the success of the surgery as establishing medical improvement is problematic for two reasons.
 
 1. Medical Improvement
 
 17
 First, while the surgery did finally effect a solid fusion of Sparhawk's L4-L5 vertebrae, we are hard-pressed to find record evidence indicating that the fusion resulted in identifiable medical improvement, as opposed simply to halting the deterioration in Sparhawk's medical condition. When Sparhawk's condition at the time of the hearing is contrasted with her condition at the time of the initial finding of disability, scant evidence of actual improvement appears. The spondylolysis and spondylolisthesis remain. Indeed, while Dr. Snodgrass characterized Sparhawk's post-fusion impairment as mildly moderate, Dr. Newby, Sparhawk's long-time treating physician, placed her impairment in the moderate category. This represents an increase, rather than a decrease, in the level of severity of Sparhawk's impairment after the successful fusion.
 
 
 18
 Further belying the claim of medical improvement are symptoms, signs, and laboratory findings appearing after the third surgery. While the x-ray indicated a solid fusion of the L4-L5 vertebrae, the September 1987 x-rays also revealed previously undiagnosed minimal movement between the L5 and S1 vertebrae.
 
 
 19
 Likewise, tests of Sparhawk's reflexes and mobility evidenced an overall deterioration in her condition by January 1988. In December 1984, before the successful fusion, tests revealed that Sparhawk's squatting ability was ninety percent of normal; she could lean over until her fingers were eleven inches above the floor; backward bend thirty degrees; bend sideways twenty degrees; rotate twenty-five degrees; bent-leg test at 130 degrees; and straight-leg test at 75 degrees. In January 1988, after the fusion, the only measurements demonstrating improvement were the rotation (now thirty degrees) and arguably the sideways bend (now at 25/20 degrees). All of the other tests revealed less mobility and flexibility. The squat was reduced to fifty percent of normal; when leaning over, fingers came within only fourteen inches of the floor; backward bend extended to only ten degrees; the bent-leg test was at 120 degrees; and the straight-leg test measured at sixty degrees. In addition, Sparhawk had gained twenty-six pounds between the two examinations and, by January 10, 1988, had reached the age of fifty. See Hammock v. Bowen, 879 F.2d 498, 503-04 (9th Cir.1989) (obesity and advanced age must be considered when assessing disability). The record evidence thus suggests that, at most, the successful fusion halted or slowed deterioration in Sparhawk's condition. It does not sustain a finding of actual medical improvement.
 
 
 20
 Furthermore, the ALJ failed to articulate any reasonable basis for preferring the opinion of Dr. Snodgrass to Dr. Newby's diagnosis. While Dr. Snodgrass was a one-time examining physician, Dr. Newby's conclusion that Sparhawk's impairment rose to the moderate level was based on years of experience treating Sparhawk. We have repeatedly instructed that, "when the conflict is between the opinions of a treating physician and an examining physician it is the rule in this circuit that '[i]f the ALJ wishes to disregard the opinion of the treating physician, he or she must make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record.' " Sprague v. Bowen, 812 F.2d 1226, 1230 (9th Cir.1987) (quoting Murray v. Heckler, 722 F.2d 499, 502 (9th Cir.1983)) (emphasis added); see also Fair v. Bowen, 885 F.2d 597, 604 (9th Cir.1989) ("The medical opinion of a treating physician is entitled to special weight."); Burkhart v. Bowen, 856 F.2d 1335, 1339 (9th Cir.1988); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir.1987) (same as Sprague ) (amended opinion); Desrosiers v. Secretary of Health & Human Servs., 846 F.2d 573, 576 (9th Cir.1988).
 
 
 21
 The ALJ offered absolutely no explanation for his decision to adopt Dr. Snodgrass's evaluation of Sparhawk's level of disability over Dr. Newby's. Not only is the opinion devoid of "specific, legitimate reasons," but in fact the ALJ misconstrued the evidence by incorrectly labelling Dr. Snodgrass a "treating physician" and by stating that Dr. Newby considered Sparhawk's impairment to be only mildly moderate after January 1988.
 
 
 22
 The ALJ's excessive focus on the successful fusion, to the exclusion of other objective indicia of no medical improvement, constitutes reversible error. In Patti v. Schweiker, 669 F.2d 582 (9th Cir.1982), the claimant's disability benefits were terminated following back surgery on the ground that she was no longer disabled. We reversed, finding a lack of substantial evidence to support the finding of medical improvement. Id. at 587. We noted that (as in Sparhawk's case) tests of the claimant's nervous system, reflexes, and motor control revealed no significant improvement in abilities between the determination of disability date and the post-surgery termination date. Id. at 586. Test results previously deemed to be consistent with a finding of disability, we stressed, cannot subsequently be treated as evidence that the disability has ceased. See id. The lack of change in the clinical status of the claimant's impairment reinforced our conclusion that substantial evidence did not support the finding of medical improvement. Id.
 
 
 23
 Similarly, in Bellamy v. Secretary of Health & Human Servs., 755 F.2d 1380 (9th Cir.1985), we found a lack of substantial evidence to justify terminating disability benefits where the ALJ selectively credited medical evidence of improvement and discounted significant objective evidence of a continuing impairment. Id. at 1381 ("While the Secretary produced some evidence that Bellamy's leg fracture had healed, there has been no clear showing of improvement in her symptoms of dizziness, pain and fainting."). We noted that medical reports corroborated Bellamy's complaints that leg pain kept her from sleeping and that she suffered from dizziness and fainting. Id. at 1382. Yet the ALJ failed to explain adequately "his rejection of uncontroverted testimony and significant probative evidence concerning Bellamy's ... impairments." Id.; see also Sprague, 812 F.2d at 1231 (substantial evidence lacking in part because ALJ "not only failed to give reasons for disregarding [the treating physician's] opinion, he failed even to mention the other evidence of [impairment]"); Gallant v. Heckler, 753 F.2d 1450, 1454 (9th Cir.1984) (ALJ improperly failed to give specific reasons for rejecting medical evidence supporting a finding of impairment).
 
 
 24
 The same errors that warranted reversal in the foregoing decisions reappear in Sparhawk's case. Like Patti, the medical evidence in terms of flexibility and mobility after surgery does not indicate improvement. To the contrary, test results demonstrate decreased mobility in many areas. Also like Patti, the clinical evaluation of her impairment did not improve. Prior to surgery, her impairment was characterized as mildly moderate. After surgery, the evaluation at best remained the same and, in the opinion of Sparhawk's treating physician, actually deteriorated to a moderate impairment. Consistent with Patti, we also hold that the diagnosis of Sparhawk's impairment as "mildly moderate" cannot be used as evidence of no disability in 1988 when it was considered consistent with disability in 1984. Moreover, the ALJ wholly fails to discuss in his opinion the objective medical tests and reports supporting impairment. While an ALJ is not bound to adopt medical diagnoses and reports, he must give specific reasons for discounting them. See, e.g., Bellamy, 755 F.2d at 1382. The ALJ here offered no such explanation.
 
 
 25
 In sum, the ALJ failed to demonstrate a medical correlation, in terms of signs, symptoms, and laboratory findings, between the successful fusion and actual medical improvement. While the fusion no doubt constituted a proper consideration in assessing improvement, the ALJ was not free to reach its conclusion " 'simply by isolating a specific quantum of supporting evidence.' " Gallant, 753 F.2d at 1455 (quoting Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir.1975)). Rather, the ALJ should have considered the whole picture of Anna Sparhawk's condition in January 1988, including the medical indicators of continued impairment, along with the successful fusion. The ALJ's failure to do so and, specifically, his failure to answer the significant medical evidence of no improvement, requires us to reverse for a lack of substantial evidence of medical improvement.
 
 2. Increase in Residual Functional Capacity
 
 26
 The second problem with the ALJ's focus on the success of the 1987 surgery is that nothing in the record connects the attainment of a solid fusion with an increase in Sparhawk's ability to work as a drill bit or moulding machine operator. Disability benefits cannot be terminated unless the claimant's medical improvement is accompanied by an actual increase in residual functional capacity. 20 C.F.R. § 404.1594(b)(2). In other words, the evidence had to show that Sparhawk's medical improvement (if any) is positively related to her ability to work. See id.
 
 
 27
 In this case, nothing in the record indicates that the vertebrae fusion sufficiently alleviated Sparhawk's condition to permit her to sit for six or seven hours a day on a hard stool and pump pedals, which is what she will have to do as a drill bit or moulding machine operator. To the contrary, what evidence does exist on this issue consists of Sparhawk's unrebutted testimony that back, leg, neck, and shoulder pain precludes her from sitting for more than an hour and a half at a time (or for more than twenty minutes at a time on a hard chair).
 
 
 28
 In his opinion, the ALJ states that Sparhawk's "improvement related to her ability to work was evidenced in the reports of her treating physicians."[1] However, nothing in the record, and specifically nothing in either Dr. Newby's or Dr. Snodgrass's reports, evaluates Sparhawk's ability after the fusion surgery to sit, stand, walk, lift, pull, or pump pedals. The ALJ cites three exhibits as supporting evidence, but not one of these reports evaluates Sparhawk's capacity to perform job-related functions. They simply discuss the successful fusion and prescribe treatment for Sparhawk's continuing pain. Apparently, the ALJ simply inferred from the evidence of a successful fusion a concomitant increase in Sparhawk's ability to work. The ALJ may not, however, set himself up as an expert on improvement in functional capacity. Cf. Burkhart, 856 F.2d at 1341 (reversible error for ALJ to "assume[ ] the role of vocational expert himself"). Consequently, we hold that the record lacks substantial evidence to support the ALJ's conclusion that Sparhawk's medical improvement sufficiently increased her residual functional capacity to permit her to work as a drill bit or moulding machine operator.
 
 B. Pain Evidence and Medical Improvement
 
 29
 The ALJ also cited as a basis for his decision that disability had terminated the unbelievability of Sparhawk's claim that she continued to suffer disabling pain after January 1, 1988. At the outset of his decision, the ALJ ruled:
 
 
 30
 The incapacity or inability of the claimant to perform substantial and gainful work because of pain caused by medically determinable impairments as of the date "disability" ended is not established by the evidence and any testimony to that effect is not given credence.
 
 Later, the ALJ elaborated on his holding:
 
 31
 While it is not doubted the claimant experienced or has some degree of pain and discomfort, the evidence does not establish that such pain, either of itself or considered in conjunction with any found impairments, was so intense or severe as to prevent or have prevented the claimant from being able to engage in some existing type of substantial gainful work as of the time "disability" is found to have ended.
 
 
 32
 By contrast, the ALJ specifically found that Sparhawk's "testimony as to pain was credible during the period from November 1984 to January 1988." He based this conclusion on her testimony that the pain was so severe that she was unable to work foot pedals or sit for more than an hour and a half. The ALJ also noted that, during this period, Sparhawk's condition worsened and she had to wear casts and braces.
 
 
 33
 We hold that the ALJ improperly discounted Sparhawk's testimony concerning pain after January 1, 1988. Sparhawk's complaints of pain alone will not support a finding of continuing disability. 42 U.S.C. § 423(d)(5)(A); Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir.1991) (en banc). Instead, Sparhawk needed to produce "objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged....' " Id. (quoting 42 U.S.C. § 423(d)(5)(A)).
 
 
 34
 Once Sparhawk satisfied this showing, the ALJ could not dismiss Sparhawk's testimony concerning pain "based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain." Bunnell, 947 F.2d at 345. Furthermore, while the ALJ was entitled to find Sparhawk's allegations of severe pain to be not credible, he needed to make specific findings that supported the non-credibility determination. Id. Bunnell mandates that these findings must be supported by the record and must be sufficiently specific to ensure that the ALJ "did not 'arbitrarily discredit a claimant's testimony regarding pain.' " Id. at 345-46 (quoting Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1215 (11th Cir.1991)). We should not be forced to speculate as to the grounds for the ALJ's rejection of Sparhawk's allegations of disabling pain. Bunnell, 947 F.2d at 346.
 
 
 35
 The ALJ failed to articulate specific reasons for disbelieving Sparhawk's pain testimony concerning the post-January 1, 1988 period. The ALJ, after all, did not deny the existence of an underlying impairment (the spondylolysis and spondylolisthesis) that could reasonably produce such pain. He simply found Sparhawk to be exaggerating the severity of the pain. Yet the ALJ proffers no rational basis for his decision to disregard Sparhawk's testimony. It cannot be that the ALJ found Sparhawk to be an untrustworthy or incredible witness. He expressly found her testimony about sitting limitations, an inability to operate foot pedals, and the excruciating level of the pain to be credible for the pre-January 1988 period. When Sparhawk broached the subject of the post-January 1, 1988 status of her disability, however, the ALJ did an about-face and announced, without explanation, that Sparhawk's credibility had evaporated.
 
 
 36
 The ALJ implicitly suggests that, with the solidifying of the fusion in January 1988, Sparhawk's back impairment was no longer capable of causing disabling levels of pain. However, the medical evidence in the record simply does not support such a conclusion. While the fusion no doubt kept Sparhawk's condition from worsening, no medical evidence was introduced either (1) suggesting that a successful fusion could or would significantly reduce Sparhawk's extant pain level or (2) explaining how much time it would take after surgery for Sparhawk's pain to diminish to tolerable levels. The record, moreover, revealed that the same condition that generated Sparhawk's disabling pain from 1984 to 1988 appeared by January 1988 to have set in at the L5-S1 area. The ALJ did not consider this as a possible alternative source of Sparhawk's pain.
 
 
 37
 The ALJ did list a number of factors he considered in concluding that Sparhawk's credibility dissolved once she began to testify about the post-January 1, 1988 period. The ALJ stated, without elaboration, that he considered in his credibility decision Sparhawk's daily activities, what medications were being prescribed, Sparhawk's appearance and credibility, doctors' comments, laboratory findings, and observable signs of impairment. However, the mere listing of factors, without explaining how each factor contributes to the credibility decision, does little to strengthen the ALJ's position. That is especially so here because an individualized review of the factors reveals that most, if not all, weigh in favor of a continued finding of disability.
 
 
 38
 Sparhawk's unrebutted testimony discloses that her daily activities consisted of light household chores, such as cooking, washing dishes, and laundry. She drives infrequently and only for short distances. These limited activities are consistent with a continuing disability. See Howard v. Heckler, 782 F.2d 1484, 1488 (9th Cir.1986) (restricted travel due to pain); Gallant, 753 F.2d at 1453 (cooking meals and washing dishes not inconsistent with disabling leg and back pain).
 
 
 39
 With respect to medications, the record reveals that Sparhawk saw a doctor at least monthly for treatment of her back, leg, shoulder, and neck pain. In early 1988, she was undergoing physical therapy and various other treatments to alleviate her pain. Such a treatment regimen is consistent with continuing severe pain.
 
 
 40
 Sparhawk's appearance and credibility cannot explain the ALJ's decision because he considered her trustworthy and believable for all aspects of her testimony except the post-January 1, 1988 evidence. Furthermore, "[t]hat a claimant does not exhibit manifestations of pain at the hearing before the ALJ is, standing alone, insufficient to rebut a claim of pain." Fair, 885 F.2d at 602.
 
 
 41
 As noted earlier, the comments of physicians in the record did not address whether Sparhawk's pain persisted at a disabling level after the successful fusion. On the other hand, the clinical laboratory findings, and especially the x-ray showing minimal movement in the L5-S1 area, support a finding of continued substantial impairment that could generate disabling levels of pain. See id. at 601. ("[I]t is possible to suffer disabling pain even where the degree of pain, as opposed to the mere existence of pain, is unsupported by objective medical findings.").
 
 
 42
 Finally, Sparhawk's frequent visits to her doctors support a finding of disability. Cf. id. at 603.
 
 
 43
 Because the listed factors strongly favor a finding of disabling pain, we cannot elevate the ALJ's rote recitation of considerations to the level of specific evidence justifying the dismissal of Sparhawk's pain testimony. Cf. Sprague, 812 F.2d at 1230-31 (mere reference, without elaboration, to inconsistencies in medical opinion does not constitute "specific, legitimate reasons" for disregarding the evidence).
 
 
 44
 The ALJ's failure properly to explain his rejection of Sparhawk's post-fusion pain testimony is in itself reversible error.
 
 
 45
 [T]he ALJ gives no reason for disregarding Varney's pain testimony, other than the assertion that her subjective complaints are disproportionate to the medical evidence; nor does he isolate particular complaints of pain and discuss the evidence suggesting that those complaints are not credible. In this circuit, these omissions are improper as a matter of law; they require that we reverse the ALJ's decision....
 
 
 46
 Varney v. Secretary of Health & Human Servs., 846 F.2d 581, 584 (9th Cir.), modified on other grounds, 859 F.2d 1396 (9th Cir.1988).
 
 
 47
 Similarly, in Gallant, we reversed a denial of disability benefits for a claimant who suffered from chronic back pain and a mild depression. There, as here, virtually every medical report noted Gallant's complaints about pain. 753 F.2d at 1455. Again, like Sparhawk, "[t]here was no positive evidence that claimant was not suffering as much pain as he claimed to suffer" and "[n]o witness, qualified expert or otherwise, expressed the opinion that claimant was in any way malingering." Id. Both Gallant and Sparhawk produced substantial medical evidence verifying the existence of a disability and its continuing objective manifestation of symptoms. Id. Although the ALJ's explanation for discrediting Gallant's pain testimony was more extensive than that offered by the ALJ in the instant case, see id., we nevertheless reversed:
 
 
 48
 Although it is within the power of the Secretary to make findings concerning the credibility of a witness and to weigh conflicting evidence, he cannot reach a conclusion first, and then attempt to justify it by ignoring competent evidence in the record that suggests an opposite result.
 
 
 49
 Id. at 1456 (citation omitted).
 
 
 50
 In sum, in finding medical improvement, the ALJ failed to explain adequately his rejection of Sparhawk's post-fusion pain testimony. Neither an unelaborated list of factors nor an unexplained finding of witness non-credibility constitutes the specific evidence commanded by Bunnell and other opinions of this court before pain testimony can be discarded.[2]
 
 CONCLUSION
 
 51
 The ALJ's decision is not supported by substantial evidence. The record did not demonstrate actual medical improvement, nor did it correlate changes in Sparhawk's medical condition with an increased residual functional capacity. Moreover, the ALJ improperly and without sufficient reason disregarded Sparhawk's testimony concerning the continuation of her disabling pain after the successful fusion.
 
 
 52
 The decision of the district court is therefore VACATED and the case REMANDED, with directions to remand the case to the Department of Health and Human Services for either a reinstatement of Sparhawk's benefits or further hearings and explanation by the ALJ.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 The ALJ mistakenly lists Dr. Snodgrass as a treating physician. As noted earlier, Dr. Snodgrass was a one-time examining physician
 
 
 [2]
 Sparhawk's request for attorney's fees under 42 U.S.C. § 406(b) is denied without prejudice to her ability to revive the request should she prevail before the ALJ on remand. Sparhawk's request for fees pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d)(1)(A) is denied. The government's position was substantially justified